James P. VEIGLE and Charles Veigle, Plaintiffs,

v.

UNITED STATES of America, Defendant,

v.

Steven F. MEAD, Vernon D. Hysell, Sandra D. Hysell, and AmSouth Bank f/k/a Orange Bank, Third–Party Defendants.

Vernon D. HYSELL and Sandra D. Hysell, Third–Party Defendants/Cross–Plaintiffs

v.

UNITED STATES of America, James P. Veigle, Charles Veigle, and AmSouth Bank f/k/a Orange Bank, Third–Party Defendants/Cross–Defendants.

No. 93–713–CIV–ORL–22.

United States District Court,
M.D. Florida,
Orlando Division.

Feb. 28, 1995.

John Ariko, Jr., Orlando, FL, pro se.

John L. Graham, Jr., Law Office of John L. Graham, Jr., Maitland, FL, for James P. Veigle and Charles Veigle.

Mary Apostolakos Hervey, U.S. Dept. of Justice, Washington, DC, for U.S.

Harrison Terry Slaughter, Jr., Leventhal & Slaughter, David Richard McFarlin, Wolff, Hill, McFarlin & Herron, P.A., Orlando, FL, for Steven F. Mead.

S. Joseph Piazza, III, S. Joseph Piazza, LL.M, P.A., William George Osborne, Osborne & Aikin, P.A., Orlando, FL, for Vernon Hysell and Sandra Hysell.

Ted Busby Edwards, Smith, MacKinnon, Harris, Greeley, Bowdoin & Edwards, P.A., Orlando, FL, for AmSouth Bank of Fla.

## MEMORANDUM DECISION

CONWAY, District Judge.

A non-jury trial was held before the Court on November 14–16, 1994 and November 29, 1994. The Court, having considered the merits of the case, makes the following finding of facts and conclusions of law.

## I. FACTUAL BACKGROUND

Third–Party Defendant Vernon Hysell is Third–Party Defendant Steven Mead's ("Mead") step-father. In March of 1991, Mead approached Vernon Hysell and suggested his father buy a one-half interest in a property owned by Mead and located on Washington Street ("Parcel 1"). Mead told his father that he had gone in with another investor on the property, that the other investor could not make the necessary payments, and that Mead was looking for a replacement investor. Vernon Hysell agree to purchase a one-half interest in the property, and made two payments to Mead totalling $35,000. At the time of this transaction the tenants of Parcel 1 had an option to purchase the building for $90,000.

Mead and Vernon Hysell memorialized their agreement in a handwritten note. Under the handwritten agreement, Mead was to record the proper papers showing the change in ownership by April 5, 1991. No such papers were filed by that date. Not recorded in this handwritten note was an oral agreement as to the disposition of the rents. According to Vernon Hysell, he was to receive one-half of the rent payments. Mead testified in his deposition [1] that Vernon Hysell was to receive $10,000 in equity in the property in lieu of receiving any share of the rents for the first year. The $10,000 in equity was the equity interest that Mead's first co-investor had in the property.

In August of 1991 the Internal Revenue Service began an audit of Labor–Rite, a company primarily owned and operated by Mead. In October of 1991 agents of the Internal Revenue Service met with Mead to discuss Mead's potential tax liability for Labor–Rite's failure to account for employee withholding taxes.

Between 1986 and 1991 Mead had engaged in several business dealings with Vernon Hysell. As a result of these dealings, Mead owed his father thousands of dollars by the winter of 1991.[2] In December, 1991, Vernon Hysell was concerned about the amount of money Mead owed him, and asked Mead to cover his obligations or provide some insurance against the money which his son owed him.

On January 31, 1992 Mead conveyed by quitclaim deed three properties to his mother and step-father, Third–Party Defendant Sandra Hysell and Vernon Hysell. Nothing was given by the Hysells to Steven Mead in exchange for the transfer, and neither Vernon Hysell nor Sandra Hysell were present when Mead executed the quitclaim deed. Mead had these conveyances recorded, but never delivered the quitclaim deed to the Hysells. Mead told the Hysells about the conveyance at a later date.[3]

The three properties which Mead deeded to the Hysells on January 31, 1992 are the subjects of the current litigation. The properties are: (1) an automotive garage at 2046 West Washington Street ("Parcel 1"); (2) a residence located at 11375 Willow Garden Drive ("Parcel 2"); and (3) an office building located at 17 North Summerlin Avenue ("Parcel 3").

In the summer of 1992, Mead orally agreed to sell the Summerlin Avenue property

---

1. Mead was unavailable to give live testimony in this case because he was in jail on the date of trial.

2. There is a dispute amongst the parties as to exactly how much Mead owed Vernon Hysell as of January 1992. The figure is certainly no less than fifty thousand dollars, and Vernon Hysell argues that the figure is close to two hundred thousand dollars. Vernon Hysell arrives at this figure by adding his investment in Parcel 3 (approximately $40,000), a fifty thousand dollar promissory note, and $102,000 on a promissory note from Mead to Vernon Hysell, which was the result of a stock buyout by Mead of Vernon Hysell's interest in Labor–Rite.

3. It is unclear how much time transpired between the time of the conveyance and Mead's informing the Hysells of the transfer. According to Vernon Hysell, the lapse was a couple of weeks; according to Mead, the lapse was two months.

("Parcel 3") to Plaintiffs James Veigle and Charles Veigle ("Veigles"). Mead represented to the Veigles that he owned that property. The Veigles never examined or researched any deeds or records concerning the ownership of Parcel 3. The Veigles approached John Day, an owner, director, and member of the loan committee at Third–Party Defendant Orange Bank.[4] The Veigles said they wanted to buy Parcel 3 from Mead for $150,000, and asked if Orange Bank would loan the Veigles $150,000 to purchase the property. Five or six weeks later, Orange Bank told the Veigles they would loan the Veigles $150,000 on the building on Parcel 3. Mead and the Veigles were good customers of Orange Bank at that time.

In November of 1991 Orange Bank had commissioned an appraisal of Parcel 3 on behalf of Mead. The appraisal was prepared by real estate appraiser Richard Likon, and at that time he estimated the present value of Parcel 3 at $285,000.[5]

Craig Crimmings ("Crimmings") was the loan officer at Orange Bank who handled this loan transaction. Crimmings testified that Orange Bank understood Mead to be the owner of Parcel 3.

Orange Bank hired attorney Thomas Warlick ("Warlick") to act as its agent for closing the loan to the Veigles. Warlick was paid by Orange Bank for his services in completing the loan deal. Warlick owned a 10% interest in Orange Bank, and testified that he has done over one thousand real estate closings in his experience.

In its written requirements for the closing, Orange Bank required that Mead execute a quitclaim deed for Parcel 3 to the Veigles. Almost a week before the closing, however, Warlick was provided with a title search that indicated that Sandra Hysell and Vernon Hysell were the owners of record of Parcel 3. The title insurance company which was covering the transaction indicated that a warranty deed was required between the Hysells and the Veigles. Two days prior to the closing, a paralegal from Warlick's firm wrote a memo to Crimmings stating that title to Parcel 3 was in the name of Sandra Hysell and Vernon Hysell. Crimmings testified that Orange Bank left it up to Warlick to take care of this matter. Warlick testified that title matters often have to be cleared up before a closing.

On July 31, 1992, the Parcel 3 loan deal was closed by Warlick at Warlick's office. Present at the closing were Mead, the Veigles, and Warlick. Warlick testified that there was no urgency to close the loan on that date, and that Orange Bank had provided a window of time up to August 14, 1994 for the closing to occur.

Mead gave the Veigles a quitclaim deed for Parcel 3 purportedly signed by both Sandra Hysell and Vernon Hysell.[6] This quitclaim deed stated that the property was conveyed from the Hysells to the Veigles as a gift and was not a taxable event.[7] The deed bears a

---

4. Orange Bank changed its name to AmSouth Bank subsequent to the events at issue.

5. In preparation for this litigation Orange Bank commissioned an appraisal of Parcel 3 by real estate appraiser Mark Carpenter, who estimated the property's value as of July, 1992, at $185,000.

 After considering the credibility of the two appraisers and their appraisals, the Court finds that the value of Parcel 3 as of July, 1992 was closer to Likon's appraisal value than the value as appraised by Mark Carpenter. The Court recognizes, however, that the Likon appraisal was conducted over half a year before the property was sold, and believes that a slight downward adjustment from the value in the Likon appraisal is appropriate in estimating the fair market value of Parcel 3 as of July, 1992. If the Court averaged the two appraisals, the estimated value of Parcel 3 would be $235,000. The Inter-

nal Revenue Service also obtained an appraisal of Parcel 3 in anticipation of this litigation. This appraisal revealed a value of $240,000 as of January, 1992.

6. Both Sandra Hysell and Vernon Hysell denied ever signing a quitclaim deed to the Veigles for Parcel 3, authorizing another to sign such a deed on their behalf, or ratifying their signatures on the deed.

7. The deed states in bold, capital letters: "NO CONSIDERATION IS BEING PAID HEREON DUE TO THIS IS A CONVEYANCE OF UNENCUMBERED REALTY AS A GIFT AND NOT TAXABLE PURSUANT TO F.A.C. SECTION 12B–4.104(2)(a)." Warlick, an experienced real estate attorney, testified that he did not know why this statutory reference was in the deed, or what specific statutory language or provision was being cited.

stamp stating that it was prepared by Thomas Warlick, though Warlick testified that the deed was not prepared by him. Warlick testified that the language of this quitclaim deed suggested that it was not even prepared at his office. Warlick testified that a lawyer knowledgeable in real estate should have known to put his own "prepared by" stamp on the deed. Warlick, in his testimony, posited that Mead must have arrived at his office with the quitclaim deed from the Hysells to the Veigles, and, as there was no "prepared by" stamp on the deed as required by law, someone at Warlick's office put his "prepared by" stamp on the deed.

Mead did not execute a quitclaim deed for Parcel 3 from himself to the Veigles. Warlick never attempted to contact the Hysells concerning the transaction. Warlick testified that it is not customary in real estate deals to call prior grantors.

At the closing Orange Bank loaned the Veigles $150,000, which was secured by a mortgage encumbering Parcel 3. James Veigle testified in his deposition that Mead and Warlick argued over what Orange Bank should do regarding a pre-existing construction lien against Parcel 3. Ultimately Warlick decided to withhold approximately $12,000 from the Veigles on account of the construction lien against the property.

Orange Bank took a security interest in Parcel 3, and in exchange gave the Veigles a check for $131,789.82. The loan proceeds of $131,789.82 were paid directly to the Veigles. The $131,789.82 check to the Veigles was prepared at Warlick's office and dated July 31, 1992.

Warlick testified that he treated the loan closing as a two-party mortgage deal and not a three-party transaction involving a transfer of title in real estate. Warlick testified that he did not remember the specifics of the transaction. James Veigle testified in his deposition that at the closing Mead and Warlick had a disagreement because Mead felt that the loan check from Orange Bank should have been made out to him. According to Jim Veigle, Warlick said that it was already 6:30 at night, and that the Veigles should just take the check from Orange Bank and write

a check to Mead for that amount out of their own account.

By personal check dated July 31, 1992, James Veigle disbursed $125,000 to purchase stock for Mead in a company owned by the Veigles. Mead approved this payment. The Veigles then gave Mead a personal check for the balance of $6,789.82, with the additional understanding that Mead would be entitled to occupy one-half of the commercial space at Parcel 3 rent-free for up to one year.

On August 5, 1992, Orange Bank recorded the mortgage, identifying itself as the creditor, the Veigles as the debtors, and Parcel 3 as the security interest.

## II. PROCEDURAL BACKGROUND

On June 23, 1993, the Secretary of the Treasury made an assessment against Mead pursuant to 26 U.S.C. § 6672 for $1,499,950.50 for liabilities incurred for taxable periods in 1988, 1989, and 1990. On that same date a Notice of Tax Lien was filed against Steven Mead in Orange County. On July 27, 1993, a Notice of Tax Lien was filed in Orange County against the Veigles as nominees of Mead for Parcel 3 and against the Hysells as nominees of Mead for Parcels 1, 2, and 3. The Veigles then instituted a wrongful levy action against the United States in this Court, and the United States joined the remaining parties as Third–Party Defendants in an action to resolve the rights of all the parties with respect to the three parcels at issue. The Hysells then filed cross-claims and counterclaims against the Veigles, the United States, and Orange Bank in order to establish their rights with respect to the properties.

The Court is now called upon to determine the rights of each of the parties with respect to Parcels 1, 2, and 3.

## III. ANALYSIS

### A. Mead's tax liability

Mead's tax liability is undisputed for the purposes of this action.

 Under 26 U.S.C. § 6151, taxes are legally due and owing and constitute a liability, regardless of when they are assessed, no

later than the date the tax return for the particular period is required to be filed. *United States v. Ressler*, 433 F.Supp. 459, 463 (S.D.Fla.1977), *aff'd* 576 F.2d 650 (5th Cir.1978), *cert. denied*, 440 U.S. 929, 99 S.Ct. 1265, 59 L.Ed.2d 485 (1979).

Mead was assessed a tax liability pursuant to 26 U.S.C. § 6672 for failure to collect, account, or pay over taxes past due. The IRS found Mead liable for unpaid unemployment taxes dating back to 1989. Since the tax liability arises as of the date the tax return for the period is due, Mead became a debtor of the United States in 1989 when the tax liabilities were due to be reported by Mead.

■ Under 26 U.S.C. § 6321, a lien in favor of the United States arises upon all of a taxpayer's property and rights to property upon notice and demand for payment of taxes. Where a taxpayer has fraudulently disposed of property prior to the existence of a federal tax lien, the United States may seek relief under the applicable state fraudulent conveyance statute. *Commissioner v. Stern*, 357 U.S. 39, 78 S.Ct. 1047, 2 L.Ed.2d 1126 (1958).

### B. *Hysells' claimed interest in the three Parcels*

The Court has previously held that the transfer of Parcels 1, 2, and 3 by quitclaim deed on January 31, 1992, from Steven Mead to Vernon Hysell and Sandra Hysell, was a fraudulent conveyance as to the Defendant United States of America ("United States").[8]

Florida's fraudulent conveyance statute provides that a creditor who seeks relief from a conveyance that falls within the fraudulent transfer provisions is entitled to avoid the transfer to the extent necessary to satisfy the creditor's claim. Fla.Stat.Ann. § 726.108(1)(a) (West 1988). Transferees of conveyances which are found to be fraudulent may nonetheless establish the priority of their interests by successfully raising any defense enumerated in Fla.Stat.Ann. § 726.109. Thus Mead's transfer of Parcels 1, 2, and 3 to the Hysells is voidable by the United States, unless and except to the ex-

tent any of the defenses under Fla.Stat.Ann. § 726.109 apply.

The Hysells assert that the United States is time barred from asserting a claim under the Uniform Fraudulent Conveyance Act. Under Fla.Stat.Ann. § 726.110(1), the United States had four years to bring its claim for relief. A brief glance at the facts of the case reveal that the fraudulent conveyance claim was not time barred.

The Court finds that Vernon Hysell's one-half interest in Parcel 1 falls within the protection afforded by Fla.Stat.Ann. § 726.109, but that the other interests claimed by Vernon Hysell and Sandra Hysell in the three properties transferred by the January 31, 1992 quitclaim deed do not fall within the relief provisions of Fla.Stat.Ann. § 726.109.

### 1. *Washington Street Property ("Parcel 1")*

■ Under Florida's fraudulent conveyance statute, a creditor may not void a transfer under Fla.Stat.Ann. § 726.105(1)(a) against any person "who took in good faith and for a reasonably equivalent value ..." Fla.Stat.Ann. § 726.109(1) (West 1988).

Mead was a debtor of the United States in March of 1991. At that time Vernon Hysell paid Mead $35,000 for a one-half interest in Parcel 1. The tenants of Parcel 1 had an option then to purchase the property for $90,000. An appraisal of the property as of January, 1992, performed at the request of the United States, revealed a value for Parcel 1 of $45,000. The Court finds that Vernon Hysell purchased the one-half interest in Parcel 1 in good faith and for reasonably equivalent value. The Court thus holds that Vernon Hysell is entitled to a one-half interest in Parcel 1.

■ The United States argues that, under 26 U.S.C. § 6323, the federal tax lien on Parcel 1 is superior to Vernon Hysell's interest in this property. The Court disagrees with the Government's analysis. The provision cited by the United States is the so-called "secret lien" provision. As is made clear by reading together 26 U.S.C. § 6321,

---

8. See the Court's Order of October 14, 1994.

Docket No. 139.

§ 6322, and § 6323, the provisions regarding priority of the federal lien apply only in instances where a party claims that its interest in the subject property arose after the federal lien had already attached. The federal lien does not attach until an assessment is made. 26 U.S.C.A. §§ 6321, 6322 (West 1989 & Supp.1994). In the instant case, the tax assessment against Mead, and thus the federal lien, did not arise until 1993. Vernon Hysell's one-half interest in Parcel 3 was established in 1991, and thus 26 U.S.C. § 6323 is inapplicable in the case at bar.

2. *Remaining interests claimed by the Hysells*

■ The Hysells argue that the conveyance to them of the properties by quitclaim deed were in satisfaction of debts owed by Mead to Vernon Hysell. The Court disagrees.

First, the Court takes issue with Vernon Hysell's accounting as to how much Mead owed him at the time of the conveyance. Vernon Hysell includes in the amount Mead owed him some $40,000 dollars on account of Vernon Hysell's interest in Parcel 3. Vernon Hysell is entitled to his share of this property, as discussed above, but cannot also count this value towards the sum owed to him by Mead.

More importantly, the evidence clearly showed that the properties conveyed by Mead had a value of over three hundred thousand dollars, while the total debt of Mead to Vernon Hysell was certainly less than half of this figure. Moreover, Mead continued to make payments on the debt owed to Vernon Hysell even after the January, 1992 transfer. This evidence suggests that the conveyance of Parcels 1, 2, and 3 was not in satisfaction of pre-existing debt.

■ The Hysells argue in the alternative that Mead's conveyance of the three parcels by quitclaim deed was as a security for a debt, and that therefore the Hysells are entitled, under Fla.Stat.Ann. § 726.109, to an equitable lien on the properties in the amount of their unsatisfied debt from Mead.

The Court finds otherwise. The Hysells did not specifically ask for these properties to be transferred to them. The quitclaim deed specified that the properties were to be transferred to both Sandra Hysell and Vernon Hysell, although Sandra Hysell admitted that she never had any business dealings with Mead. The Hysells did not know anything about the conveyance until weeks or months after it occurred. The quitclaim deed itself said nothing about a security interest, and there was no documentation contemporaneous or subsequent to the conveyance which recorded or preserved in writing the intention of creating a security interest. If the Hysells did in fact believe that a mortgage interest had been created, they did not protect their interest by requesting from Mead a writing or recording of this interest.

The Hysells proffered as a witness Mead's lawyer, John Engelhart, who had prepared and executed the January, 1992 quitclaim deed. Mr. Engelhart testified that Mead told him at the time he was executing the quitclaim deed that he (Mead) owed his dad a lot of money. Mr. Engelhart admitted that he did not remember hearing Mead say anything about a mortgage or a security interest. Mr. Engelhart testified that Mead did not say anything about wanting to avoid a tax liability. Mr. Engelhart also testified that had Mead suggested that the purpose of the conveyance was to avoid tax liability, he (Mr. Engelhart) would not have assisted Mead in the transferring of the property.

The Court finds, in light of the evidence, that Mead and the Hysells did not intend to nor did they create a security interest in the subject properties based on a debt owed to Vernon Hysell by Mead. It follows that the Hysells do not have an equitable lien in the subject properties through the operation of Fla.Stat.Ann. § 726.109.

C. *Summerlin Avenue Property ("Parcel 3")*

The Court has previously entered default judgment against the Veigles in this action.[9] The Court, however, has permitted Orange Bank to raise any defense or claim without regard to the Veigles' default.

9. See the Court's Order of October 14, 1994. Docket No. 137.

### 1. Quitclaim deed

■ A forged deed is ineffective to convey title, even as to an innocent purchaser from the grantee of such forged deed. *Love v. Elliott,* 350 So.2d 93, 95 (Fla. 1st DCA 1977); *Wright v. Blocker,* 144 Fla. 428, 198 So. 88, 91 (1940).

■ In the present case, both Sandra Hysell and Vernon Hysell deny signing, ratifying, or authorizing the signing of their names to the quitclaim deed allegedly transferring Parcel 3 from the Hysells to the Veigles. The Court finds in light of this testimony that the deed was forged. Hence neither the Veigles nor Orange Bank acquired an interest in Parcel 3 by means of the forged quitclaim deed.

### 2. Equitable Conversion

■ Though no title passed through the forged deed, Orange Bank contends that the Veigles acquired beneficial title to Parcel 3 under the doctrine of equitable conversion. Orange Bank argues that it was able to secure its mortgage against this beneficial interest.

■ The doctrine of equitable conversion "regards as done what ought to be done," in order to protect a party's interest in real property. *Weise v. Kizer,* 435 So.2d 381, 382–83 (Fla. 5th DCA 1983), *citing* 22 Fla. Jur.2d Equity § 47 (1988). Under the doctrine of equitable conversion, and upon the execution of a contract for the sale of real estate, "if the purchase price is paid and the seller fails to voluntarily convey the legal title, the purchaser is entitled to apply to a court of equity ... to have the court require the seller, or his successors in interest with notice, to convey the legal title to the buyer." *Cain v. Bultman, Inc. v. Miss Sam, Inc.,* 409 So.2d 114, 119 (Fla. 5th DCA 1982).

■ The doctrine of equitable conversion holds that, upon the entry of an agreement to convey title to realty, the buyer obtains equitable title and the seller retains naked legal title in trust for the buyer. Under Florida law, a subsequent creditor of the seller cannot attach the realty where the equitable title resides in a third party. *Hull v. Maryland Casualty Co.,* 79 So.2d 517, 518 (Fla.1954), *opinion modified on reh'g,* 79 So.2d 518.

In the present case, Mead agreed with the Veigles to sell his interest in Parcel 3 for $150,000. Since the Court has already found that Mead did not transfer his interest in Parcel 3 to the Hysells, see *supra,* Mead still held title to Parcel 3 at the time of the July, 1992 transaction. Mead did not in fact convey his interest in Parcel 3 through this transaction, however, because he produced an ineffective deed from the Hysells to the Veigles. The Veigles performed their end of the bargain by paying Mead for the property. Orange Bank argues that equity would find that the Veigles hold the equitable title to Parcel 3, that Mead holds his interest in Parcel 3 in constructive trust for the Veigles, and that the United States as a creditor of Mead cannot attach Parcel 3 because Mead only has bare legal title to the property.

It is an accepted maxim that "one who comes into equity must come with clean hands" or else all relief will be denied regardless of the merit of the claim. *Roberts v. Roberts,* 84 So.2d 717, 720 (Fla.1956). "Clean hands" demands from those who seek equitable relief fair dealing, decency, good faith, fairness, and justice. *Brooker v. Smith,* 108 So.2d 790, 794 (Fla. 2d DCA 1959). "It is not necessary that the [unclean] act be a crime; it is enough that it be condemned by honest and reasonable men." *Roberts,* 84 So.2d at 720.

The parties in the present case should have been aware that the transaction unfolding before them was of a highly questionable nature. If they did not know the transaction was suspect, they were guilty of wilful ignorance given the numerous irregularities in the transaction, including: (1) the price Mead was willing to accept for a property with a significantly higher appraisal value; (2) the requirement that Mead execute a quitclaim deed to the Veigles, a requirement which eventually was neither satisfied nor insisted upon; (3) the sudden discovery that the Hysells were the record titleholders; (4) the absence of the Hysells at the closing; (5) the presence of Mead at the closing; (6) the strange language and unusual appearance of

the quitclaim deed bearing the Hysells' signatures; (7) the lack of a proper "prepared by" stamp on the quitclaim deed; (8) the fact that the quitclaim deed from the Hysells to the Veigles, two unrelated parties, was worded in the form of a gift with no taxable consequences [10]; (9) Mead's insistence at the closing that the loan check be made out to him; and (10) the lack of written documentation for the sale of Parcel 3 to the Veigles.

All these peculiarities should have put the parties on notice as to the suspicious nature of the transaction, especially Thomas Warlick, Orange Bank's agent and an experienced real estate attorney. Parcel 3, with an appraised value of $285,000, was being transferred between unrelated parties (Veigles and Hysells), as a gift with no taxable consequences, and yet neither the Veigles, Warlick nor Orange Bank made further inquiry into the origin or validity of the deed, or the nature of the Hysells' ownership interest. Especially where there was no urgency in closing the deal, the Court finds a conscious disregard of the improprieties swirling around the transaction.

As between two parties who are victims of a misdeed, "the least innocent should suffer, and the least innocent is the one who could have prevented the misdeed." *Countrywide Funding Corp. v. Palmer,* 589 So.2d 994, 996 (Fla. 2d DCA 1991). Mead attempted to sell the Veigles a property by means of a forged deed, and at a price which was significantly less than its market value. The Veigles and Orange Bank were victim's of Mead's misdeed, but so also was the United States. The Court finds that the Veigles and Orange Bank could have protected themselves in the purchase and loan transaction of Parcel 3 through reasonable inquiry and investigation. James Veigle admitted in his deposition he conducted no inquiry as to the ownership of Parcel 3, and just signed the papers that were put in front of him at the closing.

The Court declines to invoke the doctrine of equitable conversion under these circumstances, and thus the Veigles did not obtain an interest in Parcel 3. It follows that the Veigles had no interest to transfer to Orange Bank. Consequently the mortgage agreement between the Veigles and Orange Bank could not and did not convey any interest in Parcel 3 to Orange Bank. Orange Bank thus has no interest in Parcel 3, either superior to or inferior to the claim of the United States.

The Court does not reach the question of whether the transfer from Mead to the Veigles was a fraudulent conveyance as to the United States.

### D. *Damages claimed by the Hysells*

The Hysells seek damages against the Veigles on the theory that the Veigles were unjustly enriched by receiving rents from Parcel 3, since the Veigles' title was based on a forged deed, and title was properly with the Hysells. The Hysells also seek damages against Orange Bank for negligence. The Hysells assert that Orange Bank caused the Hysells loss by assisting in the transaction which purportedly conveyed title to the Veigles through the forged deed. The Hysells also seek to hold the United States liable for negligent management of Parcels 2 and 3.

Since the Court finds that the Hysells did not have title to Parcel 2 or Parcel 3, see *supra,* the Court dismisses these claims.

### III. CONCLUSION

Florida's fraudulent conveyance statute provides that a creditor who seeks relief from a transfer that falls within the fraudulent transfer provisions is entitled to avoid the transfer to the extent necessary to satisfy the creditor's claim. Fla.Stat.Ann. § 726.108(1)(a) (West 1988). The Court has previously held that the transfer by quitclaim deed on January 31, 1992, from Steven Mead to Vernon Hysell and Sandra Hysell, was a fraudulent conveyance as to the Defendant United States of America ("United States"). Thus Mead's transfer of Parcels 1, 2, and 3 to the Hysells is voidable by the United States, except that Vernon Hysell retains a one-half

---

**10.** As an additional curiosity, the quitclaim deed stated that the gift was not taxable because the realty was unencumbered, yet the parties all agree that there was a construction lien on the property at the time of the conveyance. Orange Bank even withheld funds from the Veigles due to the existence of this lien.

interest in Parcel 1, the Washington Street property.

As to Orange Bank, the Court declines to exercise its equitable authority and invoke the doctrine of equitable conversion under the facts. Since the Veigles do not have any legal or beneficial interest in Parcel 3, the Veigles could not give Orange Bank any interest in Parcel 3.

The Court dismisses the damage claims asserted by the Hysells against the Veigles, Orange Bank, and the United States. These damage claims were predicated on the Hysells' alleged property interests in Parcel 2 and 3, and the Court holds today that the Hysells did not have any property interests in these parcels.

Accordingly it is **ORDERED and AD-JUDGED** that Third–Party Defendant Vernon Hysell has a one-half interest in the property described in this Memorandum Decision as Parcel 1. This one-half interest is superior to the interest acquired by Defendant United States of America by virtue of the tax liens filed on June 23, 1993 and July 27, 1993.

It is **FURTHER ORDERED and AD-JUDGED** that Defendant United States of America has an interest in the properties described in this Memorandum Decision as Parcels 1, 2, and 3, by virtue of the tax liens filed June 23, 1993 and July 27, 1993. This interest is superior to the interests of Plaintiffs James Veigle and Charles Veigle, and Third–Party Defendants AmSouth Bank, Steven Mead, Sandra Hysell, and Vernon Hysell, except to the extent of Vernon Hysell's interest in Parcel 1.

It is **FURTHER ORDERED** that Third–Party Defendants Sandra Hysell's and Vernon Hysell's motion in limine (Dkt. 124) is **MOOT.**

It is **FURTHER ORDERED** that Third–Party Defendant Orange Bank's Motion to Strike Admitted Fact (Dkt. 155) is **MOOT.**

DONE AND ORDERED.